AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

United States of America
v.
Andres Felipe Restrepo Uribe,
Luis Alberto Sinisterra Lozano, and
Yon Freddy Sanchez Chavarro

*Defendant(s)*

Case No. 3:25-mj-1268-MCR

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 31, 2025 through June 1, 2025 in the county of Duval in the Middle District of Florida, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 959(a), 21 U.S.C. § 960(b)(1)(B), 21 U.S.C. § 963 | Attempt and Conspiracy to distribute five kilograms or more of cocaine, intending, knowing, and having reasonable cause to believe that the cocaine would be unlawfully imported into the United States. |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

Kevin Doheny
*Complainant's signature*

Kevin Doheny, Special Agent - Drug Enforcement Administration
*Printed name and title*

Sworn to before me over the telephone or other reliable electronic means and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: 6/11/2025

Monte C. Richardson
*Judge's signature*

City and state: Jacksonville, FL

Monte C. Richardson, United States Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kevin Doheny, a Special Agent (SA) with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state as follows:

1. This affidavit is submitted in support of a complaint and arrest warrants for three individuals, Andres Felipe RESTREPO URIBE; Luis Alberto SINISTERRA LOZANO; and Yon Freddy SANCHEZ CHAVARRO. There is probable cause to believe that RESTREPO URIBE, SINISTERRA LOZANO, and SANCHEZ CHAVARRO attempted, and conspired, to distribute five kilograms or more of cocaine, intending, knowing, and having reasonable cause to believe that the cocaine would be unlawfully imported into the United States in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), and 963. Venue is proper in the Jacksonville Division in the Middle District of Florida pursuant to 18 U.S.C. § 3238, as the DEA plans to "first bring" RESTREPO URIBE, SINISTERRA LOZANO, and SANCHEZ CHAVARRO to the Jacksonville Division of the Middle District of Florida. *See* 18 U.S.C. § 3238 ("The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought . . . ").

2. The statements set forth in this affidavit are based upon my training and experience, consultation with other experienced investigators, agents, and other sources of information related to this and other investigations. This affidavit is intended to set forth probable cause in support of the criminal complaint and arrest

warrants and does not purport to set forth all of my knowledge or the entirety of the facts of this investigation. Unless otherwise specified, the undercover officer, confidential source, and defendants described herein communicated in Spanish.

## BACKGROUND OF AFFIANT

3. I am a SA with the DEA, and as such, I am empowered under 21 U.S.C. § 878 and other criminal laws of the United States, to make arrests, and obtain and execute search, seizure, and arrest warrants. I have been a SA with DEA since 2017; prior to joining DEA, I was a police officer with the Panama City Police Department in Panama City, Florida for approximately seven years.

4. As part of my official duties, I investigate civil and criminal violations of the Controlled Substances Act, Title 21 of the United States Code. During the course of my career in law enforcement, I have participated in numerous drug trafficking investigations, conducted electronic surveillance, and spoken with defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances and of the laundering and concealing of proceeds from controlled substance trafficking. In furtherance of my investigations, I have used numerous investigative techniques, including undercover transactions, controlled purchases, and been granted federal and state search warrants.

## PROBABLE CAUSE

5. The DEA has an office in Costa Rica and works closely with Costa Rican authorities to enforce Costa Rican and international drug laws. In May 2025, the DEA, in coordination with the Costa Rican DEA Vetted Unit (VU), which is

comprised of officers from the Policia de Control de Drogas (PCD) and Fuerza Publica (FP),[1] received information regarding a transnational criminal organization (TCO) based in San Jose, Costa Rica.

6. I did not personally participate in the operations described below, but instead learned the following information from reviewing Costa Rican law enforcement reports, photographs, speaking with other special agents in Costa Rica and elsewhere, and reviewing audio and video recordings, messages, and reports with the aid of an agent who speaks Spanish.

7. The DEA learned that a TCO was distributing cocaine hydrochloride on a medium and large scale, in part, through SINISTERRA LOZANO. SINISTERRA LOZANO is a Colombian national and a naturalized citizen of Costa Rica with a Costa Rican residence card number. The DEA further learned that SINISTERRA LOZANO's role was to negotiate drug deals on behalf of the TCO.

8. In furtherance of the investigation, a VU officer, in his capacity as an undercover officer (hereinafter the "UC"), communicated with SINISTERRA LOZANO. SINISTERRA LOZANO was introduced to the UC by a professional DEA confidential source. The UC knows he was speaking with SINISTERRA LOZANO because the phone number he was communicating with is known to belong to SINISTERRA LOZANO from DEA intelligence analysis; further as set

[1] PCD and FP are Costa Rican law enforcement groups. A "vetted" unit includes hand-picked local officers who undergo a series of checks and investigations to work on high-profile international investigations.

forth below, a meeting time was set during the communications, and SINISTERRA LOZANO himself showed up to that meeting. SINISTERRA LOZANO was additionally identified after the meeting through VU law enforcement systems.

9. During the communications, SINISTERRA LOZANO explained to the UC that he had export quality cocaine for sale for $4,300[2] per kilogram of cocaine. The UC agreed to meet with SINISTERRA LOZANO on May 31, 2025 in the Luko Shopping Plaza in the Curridabat sector, Zapote, Costa Rica.

**May 31, 2025 Controlled Buy**

10. On May 31, 2025, VU officers conducted a briefing, during which it was planned that UC would meet with SINISTERRA LOZANO regarding a potential controlled buy of cocaine. The UC was fitted with an audio/video transmitting/recording device. I have reviewed portions of the resulting recordings relevant to the UC's activities described below.

11. After the briefing, during the early morning of May 31, 2025, VU officers established surveillance in the Luko Shopping Plaza. At approximately 11:30 a.m., VU officers observed SINISTERRA LOZANO arrive in a white Hyundai Avante bearing Costa Rican license plate AAA-646; he was wearing a white shirt and black pants.

12. Upon arriving, SINISTERRA LOZANO met with the UC. During the meeting, which was audio and video recorded, SINISTERRA LOZANO explained

[2] Later confirmed to be U.S. dollars.

that he was part of a group with specific intentions to distribute high quality export cocaine to the United States. I listened to a recording of this interaction with the aid of a Spanish speaking agent and it confirmed the same.

13. SINISTERRA LOZANO further told the UC that his contact recently received 228 kilograms of cocaine but, that due to high demand, the majority of the cocaine had already been sold. SINISTERRA LOZANO explained, however, that his contact had 71 kilograms of cocaine for sale remaining at a price of $4,300 per kilogram of cocaine.

14. To further the investigation, and to corroborate this information, the UC then arranged with SINISTERRA LOZANO for a controlled purchase of one kilogram of cocaine from SINISTERRA LOZANO in exchange for $4,300 in U.S. dollars. SINISTERRA LOZANO explained to the UC that SINISTERRA LOZANO would meet with an associate who would handle the drug transaction. SINISTERRA LOZANO agreed to complete the controlled buy in the parking lot of McDonald's in La Sabana West, next to the National Stadium of Costa Rica. Once the meeting was over, VU officers maintained surveillance on SINISTERRA LOZANO.

15. At about 11:50 a.m. on May 31, 2025 (the same day), SINISTERRA LOZANO was observed by VU officers driving the same white Hyundai Avante. VU officers followed SINISTERRA LOZANO to a section of the city of San Jose called Rohrmoser, Nunciatura, where SINISTERRA LOZANO eventually arrived.

SINISTERRA LOZANO remained at the building in Nunciatura until approximately 2:00 p.m.

16. VU officers closely followed SINISTERRA LOZANO and did not lose sight of him during the surveillance. Nevertheless, SINISTERRA LOZANO's driving pattern and unusual routes of travel were consistent with someone involved in criminal activity attempting to thwart law enforcement efforts to follow him.

17. At approximately 2:30 p.m., a male, later identified during his arrest as Andres Felipe RESTREPO URIBE, arrived at the Nunciatura building where SINISTERRA LOZANO was located. RESTREPO URIBE arrived in a gray Lexus NX300H, bearing Costa Rican license plate LZR-001. RESTREPO URIBE is a Colombian national and a naturalized Costa Rican citizen. VU officers observed that RESTREPO URIBE first met with SINISTERRA LOZANO, then they both went into the parking lot of the Torres de Paseo Colon condominiums. VU officers remained in the area but could not see the interaction between SINISTERRA LOZANO and RESTREPO URIBE.

18. At approximately 2:45 p.m., RESTREPO URIBE left the parking lot of the Torres de Paseo Colon condominium in the Lexus NX300H, but remained in the area of Torre Mercedes, San Jose, Costa Rica.

19. During this same timeframe, law enforcement followed SINISTERRA LOZANO while he was driving the white Hyundai. SINISTERRA LOZANO was observed driving from the parking lot of the Torres de Paseo Colon condominium before eventually arriving at a McDonald's in La Sabana Oeste, next to the National

Stadium of Costa Rica. After SINISTERRA LOZANO arrived in the McDonald's parking lot, SINISTERRA LOZANO parked and met with the UC. During the interaction, the UC explained the cocaine was destined for Phoenix, Arizona.

20. SINISTERRA LOZANO provided the UC with a rectangular package. The package was sealed with a gray tape that had a white label with a blue "LA" logo on it. When eventually opened, the package contained cocaine hydrochloride. I know based on my training and experience that the use and placement of the LA logo on packages of cocaine is in and of itself indicative of a sophisticated TCO; that is because organized and/or sophisticated TCOs use labels and/or logos to differentiate their quality of their cocaine from their competitors. It should also be noted that blue "LA" logo on the packages is associated with the Los Angeles Dodgers baseball team in Los Angeles, California, United States; this further corroborates SINISTERRA LOZANO's statements that the cocaine was ultimately destined for importation into the United States. After receiving the package of cocaine, the UC gave $4,300 in U.S. dollars to SINISTERRA LOZANO in exchange for the cocaine. SINISTERRA LOZANO counted the money in front of the UC.

21. During the controlled buy of the one kilogram of cocaine, SINISTERRA LOZANO told the UC that his buddy had 70 (additional) kilograms of cocaine ready for immediate distribution and that he could get more drugs in future. SINISTERRA LOZANO also told the UC that the 70 additional kilograms were packaged in a similar manner with the same characteristics as the one-kilogram

package of cocaine he just bought. The UC agreed to buy the 70 kilograms of cocaine, and the two planned to meet on June 1, 2025 (the next day), at the Torres de Paseo Colon condominium. After further discussions, and the UC and SINISTERRA LOZANO eventually parted ways.

22. Immediately after the controlled buy described above, the UC went to the Central Offices of the Policia de Control de Drogas (a drug investigative law enforcement agency), and, as witnessed by other PCD officers, placed the cocaine into evidence. The cocaine had a total approximate weight of 1,132 grams, and field tested positive for cocaine hydrochloride. The cocaine was then submitted to the Costa Rican Forensic Sciences Laboratory, Analytical Chemistry Section for analysis. The results are pending.

23. The UC and SINISTERRA LOZANO kept in communication after the deal. During their communications, SINISTERRA LOZANO stated he would use a vehicle with a hidden compartment, commonly referred to as a "trap," to deliver the 70 kilograms. SINISTERRA LOZANO explained the hidden compartment within the vehicle would contain 70 packages of cocaine and was concealed in a manner that would be difficult for law enforcement to find it, which gave SINISTERRA LOZANO's organization a significant advantage during a police checkpoint or law enforcement encounter. The UC and SINISTERRA LOZANO agreed to discuss the transaction further during the morning of June 1, 2025.

**<u>Arrests on June 1, 2025</u>**

24. On June 1, 2025, VU officers conducted a briefing, during which it was planned that the UC would meet with SINISTERRA LOZANO, identify the trap vehicle, and confirm the 70 kilograms of cocaine were in the hidden compartment. The UC did not have any U.S. currency to make the controlled buy, but was fitted with an audio/video transmitting/recording device. (Again, I have reviewed portions of the resulting recordings relevant to the UC's activities described below.) After the briefing, law enforcement established surveillance in and around the parking lot of the Torres de Paseo Colon condominium.

25. On June 1, 2025, at approximately 11:00 a.m., the UC was in an undercover vehicle at the entrance to the parking lot of the Torres de Paseo Colon condominium. During a conversation, SINISTERRA LOZANO told the UC that his contact was going to meet with the UC and let him into the parking lot.

26. A short time later, RESTREPO URIBE arrived and allowed the UC to enter the parking lot. RESTREPO URIBE then got into the UC's vehicle and told the UC to go to the second level of the parking garage, where they planned to wait for another person to arrive with the trap vehicle. Eventually, RESTREPO URIBE stated the trap vehicle arrived and was at the entrance to the parking lot. RESTREPO URIBE left to meet the trap vehicle and the UC remained on the second floor of the parking lot.

27. A gray Hyundai Tucson (later identified as the trap vehicle), with Costa Rican license plate 869689, then arrived at the scene. During his later arrest, law enforcement identified the driver of the Tucson as Yon Freddy SANCHEZ

CHAVARRO. SANCHEZ CHAVARRO is a Venezuelan national and a permanent resident of Costa Rica. RESTREPO URIBE and SINISTERRA LOZANO were in the passenger seats of the trap vehicle.

28. SINISTERRA LOZANO, RESTREPO URIBE, and SANCHEZ CHAVARRO went up to the second-floor of the parking garage. SANCHEZ CHAVARRO told the UC that the cocaine was hidden in a man-made compartment under the driver and passenger seats and that the screws that held the seats in place needed to be removed, which allowed access to a panel that concealed the drugs. After listening to SANCHEZ CHAVARRO explain the process, the VU officers began to execute the take-down and detain those involved.

29. At approximately 11:50 a.m., the VU officers detained SINISTERRA LOZANO, RESTREPO URIBE, and SANCHEZ CHAVARRO in the parking lot of the Torres de Paseo Colon condominium. In an adjacent parking lot, officers located SINISTERRA LOZANO's white Hyundai Avante and RESTRPO URIBE's gray Lexus. In another parking lot, a bit further away was SANCHEZ CHAVARRO's grey Kia Rio bearing license plate number JGJ003.

30. At approximately 12:37 p.m., SINISTERRA LOZANO, RESTREPO URIBE, and SANCHEZ CHAVARRO were transported to Fuerza Publica Police Station in La Sabana. Officers arranged for the vehicles, including the gray Hyundai Tucson (the trap vehicle) to be brought to the police department.

31. At approximately 1:10 p.m., the Mounted Police Fuerza Publica, in conjunction with the Officers from PCD, obtained inspection authority from the

Coordinating Poder Judicial Prosecutor of the Specialized Jurisdiction against Organized Crime[3] to search the gray Hyundai Tucson (trap vehicle). During the search of the Hyundai, officers located the following items:

a. In the driver side's hidden compartment – 36 packages of presumptive cocaine;
b. passenger side hidden compartment – 34 packages of presumptive cocaine;
c. a Glock, Model 19, 9mm firearm;
d. a Glock magazine with 15 rounds of 9mm hallow-point ammunition;
e. a Glock magazine with 15 rounds of 9mm ammunition;
f. tools that were the same size as the screws for the hidden compartments;
g. a toll receipt from 5/26/2025; and
h. a prepaid phone card and SIM card packaging.

32. The 70 packages of presumptive cocaine recovered from inside the trap vehicle were wrapped in a similar manner as the one kilogram of cocaine purchased on May 31, 2025, in that they were gray rectangular shaped packages with a white label and blue "LA" logo. It should be noted that the "LA" logo was in varying shades of blue.

[3] Meaning, their prosecutor authorized the search of the trap car.

33. Officers collected a random cocaine package from the trap vehicle and weighed it; it weighed approximately 1,118 grams. They then cut it open, which revealed a first layer of gray tape, a second layer of black latex, a third, fourth and fifth layer of transparent plastic were then revealed that concealed a white solid substance that was imprinted with the letters "LA," which matched the letters on the outer white label. Officers then conducted a presumptive field test, which yielded a positive result for cocaine hydrochloride. The cocaine was submitted to the Forensic Sciences Laboratory, Analytical Chemistry Section, for forensic analysis.[4]

34. At approximately 2:15 p.m., a K9 officer with the Fuerza Publica arrived with a K9 that was trained in identifying the odors of controlled substances. The K9 positively alerted to the presence of controlled substances in the white Hyundai Avante and the gray Lexus, and the gray Hyundai Tucson.[5]

35. At approximately 3:15 p.m., a search of the gray Lexus was conducted and the following items, among others, were seized:

a. a Smith and Wesson, Model SD9VE firearm;

b. a Smith and Wesson magazine with 13 rounds of 9mm ammunition;

---

[4] Upon the approval of a mutual legal assistance treaty (MLAT) request, the cocaine would be tested by DEA Southeastern Laboratory in Miami.

[5] Based on my training and experience, my impression from reading the reports is that the K9 was used to search for the presence of further controlled substances in the trap vehicle, besides what was already recovered.

c. RESTREPO URIBE's wallet which contained two driver's licenses in the name of Andrés Felipe RESTREPO URIBE, six cards from different banks in the name of Andrés Felipe RESTREPO URIBE, two weapons cards from the Ministry of Public Security in the name of Andrés Felipe RESTREPO URIBE, a permanent resident card in the name of Andrés Felipe RESTREPO URIBE, an identity card in the name of Andrés Felipe RESTREPO URIBE;

d. a SIM card;

e. nine bills of ten thousand colones for a total of ninety thousand colones[6] (₡90,000), three bills of five thousand colones for a total of fifteen thousand colones (₡15,000), one bill of two thousand colones (₡2,000), three bills of one thousand colones for a total of three thousand colones (₡3,000), for a total result of one hundred and ten thousand colones (₡110,000);[7] and

f. forty-three bills of one hundred dollar U.S. Currency ($4,300), nine bills of fifty dollars ($450), one bill of twenty dollars ($20), thirteen five-dollar bills ($65), thirteen one-dollar bills ($13) for a total of four thousand eight hundred and forty-eight in U.S. dollars ($4,848).

---

[6] Colones is Costa Rican currency.

[7] This the equivalent of approximately $220 in U.S. currency.

36. At approximately 4:00 p.m., a search of the Hyundai Avante was conducted with the following items seized:

a. a Samsung cell phone;

b. documentation, including a sheet of paper corresponding to a criminal record certificate from the Judicial Branch in the name of Luis SINISTERRA LOZANO.

37. At some point during arrest processing, law enforcement located the gray Kia Rio, a key to which was on the person of SANCHEZ CHAVARRO. At approximately 4:45 p.m., a search of the gray Kia Rio was conducted and the following items were seized:

a. a brown leather wallet, with various documents including a driver's license from the Republic of Venezuela in the name of SANCHEZ CHAVARRO, a membership card of the Pricesmart commercial premises, and a digital signature card of the Banco de Nacional, both in the name of SANCHEZ CHAVARRO;

b. a sheet of paper with notes of outstanding accounts and currency exchange;

c. a notebook with pay/owe sheets of names of people who owe various amounts of money; and

d. seven bills of twenty U.S. dollars ($140) for a total of one hundred and forty U.S. dollars.

38. Officers conducted searches of SINISTERRA LOZANO, RESTREPO URIBE, and SANCHEZ CHAVARRO while at the Mounted Police Department in San Jose, La Sabana, Mata redonda, Costa, Rica. RESTREPO URIBE was in possession of three cell phones (Apple iPhone 14 with no visible IMEI number, Apple iPhone 11 with an IMEI number 356786289256053, and an Apple iPhone with IMEI number 357091126897808).

39. SINISTERRA LOZANO was in possession of a brown leather wallet containing several bank cards including two cards from BAC San José, one of them in the name of José Sinisterra,[8] and another in the name of Luis Sinisterra, two Scotiabank cards in the name of Luis Sinisterra, a National Bank card in the name of Luis Sinisterrra, two driver's cards in the name of Luis Sinisterra, and a provisional card corresponding to a work permit in the name of Luis Sinisterra. SINESTERRA LOZANO was also in possession of an Apple iPhone 15 Max Pro with no visible IMEI number.

40. SANCHEZ CHAVARRO was found in possession of a brown leather wallet, which included a card from the Promerica bank in the name of Gloria Mejía, three cards from the national bank, a card from the Davivienda bank, two cards from the Mutal group bank, and a card from the Bancolombia bank. All cards besides the card from Promerica bank was in the name of Yon Fredy SANCHEZ CHAVARRO. Inside the same wallet, VU officers located two Costa Rican driver's licenses type A3

[8] SINISTERRA LOZANO's full name is Luis Alberto SINISTERRA LOZANO.

and B1, a driver's license from the country of the Republic of Venezuela, a firearms card from the Ministry of Public Security, two identity cards from the Republic of Colombia, a registration card for a Glock weapon from the Ministry of Public Security, and a registration card for a Sig Sauer-type firearm—

all of which were in the name of Yon Fredy SANCHEZ CHAVARRO.

41. Furthermore, SANCHEZ CHAVARRO was found in possession of an Apple iPhone 15 without a visible IMEI number, another Apple iPhone with IMEI number 356861162442046. SANCHEZ CHAVARRO also had a bill of twenty thousand colones (₡20,000), a bill of two thousand colones (₡2,000) for a total of twenty-two thousand colones (₡22,000); in addition, he had two bills of twenty American dollars ($40), a bill of ten dollars ($10), three five-dollar bills ($15), one one-dollar bill ($1) for a total of sixty-six dollars ($66).

42. Officers arrested SINISTERRA LOZANO, RESTREPO URIBE, and SANCHEZ CHAVARRO and booked them in to Public Ministry of Costa Rica, First Circuit, San Jose judicial section. The items described herein were photographed and collected, then submitted into evidence at the PCD station.

**<u>The Exportation of Cocaine to the United States</u>**

43. I am aware that cocaine hydrochloride (cocaine HCL) is an intense, euphoria-producing stimulant drug with strong addictive potential. Cocaine is derived from coca leaves grown in Colombia, Peru, and Bolivia and the manufacturing process typically takes place in remote clandestine jungle labs where the raw cocaine product undergoes a series of chemical transformations. Colombia

produces approximately 90 percent of the cocaine powder destined for the United States.

44. As previously mentioned, SINISTERRA LOZANO and RESTREPO URIBE were of Colombian nationality but naturalized Costa Ricans. I am aware that Mexico and Central America, which includes Costa Rica, are primary transportation corridors for United States-bound cocaine and that the majority of cocaine shipments transported to the United States pass through the Central America and Mexican corridors.

45. Additionally, I have made further contacts with my DEA counterparts internationally and learned that the "LA" logo utilized by this TCO has been displayed on packages of cocaine that have been seized recently by law enforcement in Colombia, Panama and Honduras, and during a seizure in California.

46. Cocaine is a Controlled Substances Act Schedule II substance, which means it has a high potential for abuse but also has an accepted medical use for treatment in the United States. Cocaine solution can be used as a medical local anesthetic, can be used to reduce bleeding in the mouth, nose, and nasal cavities. However, there are now more effective legal medical treatments and cocaine is now rarely used medically used in the United States. Medical grade cocaine is regulated by the United States government; whereas, clandestine made cocaine is not.

## Conclusion

47. Based upon the aforementioned information, events, and my training and experience, I submit that there is probable cause to believe that RESTREPO

URIBE, SINISTERRA LOZANO, and SANCHEZ CHAVARRO attempted, and conspired, to distribute five kilograms or more of cocaine, intending, knowing, and having reasonable cause to believe that the cocaine would be unlawfully imported into the United States in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), and 963.

I, Kevin Doheny, a DEA Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

Kevin Doheny
Special Agent
Drug Enforcement Administration

Affidavit submitted to me by reliable electronic means and attested to me as true and accurate by telephone or other reliable electronic means consistent with Fed. R. Crim. P. 4.1 and 4(d) before me this 11th day of June, 2025.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF FLORIDA